# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA <br><br> v. <br><br> ANTONIO PAREDES PEREZ, <br><br> *Defendant.* | CASE NO. 3:18-cr-30 <br><br> MEMORANDUM OPINION & ORDER <br><br> JUDGE NORMAN K. MOON |

Defendant Antonio Paredes Perez is charged with illegal reentry following a prior removal from the United States without authorization to reenter, in violation of 8 U.S.C. § 1326(a). Defendant moved to suppress the evidence obtained from him following his arrest, arguing that the immigration officers' searches of various computer databases did not establish probable cause for his arrest. Since the immigration officers independently had probable cause to arrest Defendant for illegal reentry when they took him into administrative custody—probable cause that was supported by investigation and facts well beyond the database searches alone— the Court concludes that there was no constitutional violation and suppression is not appropriate. The motion will be denied.

## Background

Considering the testimony and evidence presented, the Court makes the following findings of fact as to Defendant's motion to suppress.

Defendant's alien file or "A-File" documented his encounters with immigration officials. Dkt. 68 at 6:11–18.[1] Defendant's file showed that he was encountered in the United States in

---

[1] "An INS A-File identifies an individual by name, aliases, date of birth, and citizenship, and all records and documents related to the alien are maintained in that file." United States v. Sosa-Carabantes, 561 F.3d 256, 258 n.3 (4th Cir. 2009) (citation omitted).

2005 and was granted a voluntary return to Mexico. Dkt. 68 at 6:24–25. The alien file also showed that when Defendant tried to enter the United States again, he was detained and removed pursuant to an expedited order of removal in March 2013; and when Defendant tried to return to the United States again, his expedited order of removal was reinstated in October 2013. Dkt. 68 at 6:19–7:5; id. at 25:11–17; Dkt. 67 at 10 (showing October 23, 2013 date of departure); see also Dkt. 32 Exs. 1, 2 (orders of removal, showing October 24, 2013 removal); Dkt. 87-1 at 1 ("Warning to Alien Ordered Removed or Deported," dated October 23, 2013).

In 2015, Defendant was arrested for assault by Charlottesville police and was incarcerated in ACRJ, the Albemarle/Charlottesville Regional Jail. Dkt. 68 at 7:6–21; see also Dkt. 67 at 14. He was released from custody before Immigration and Customs Enforcement ("ICE") could act. Dkt. 68 at 8:7–8.  Thereafter, ICE opened a Field Operations Worksheet or "FOW" for Defendant. Id. at 8:17–18. A FOW is prepared in anticipation of a targeted immigration enforcement action. Dkt. 78 at 4:5–7. Defendant's FOW was set aside in 2015 when ICE was unable to find him. Dkt. 68 at 8:17–18.

In or around April 2018, ICE deportation officer Klauenberg was conducting research into old FOWs when he found what he believed was a current address where Defendant was living. Dkt. 68 at 7:23–8:7. Klauenberg conducted surveillance of that address, and though he did not see Defendant, Klauenberg ran registration checks for vehicles at that address: one was registered in Defendant's name, another was registered in the name of a female with Defendant's last name, and a third was registered to a male with a similar last name. Id. at 9:3–10:2. All three vehicles had different addresses listed for their registrations. Id. at 10:1–2. Klauenberg was unable to say at that time, based on his research and Defendant's alien file, whether Defendant was married or had any children, parents, or siblings in the United States. Id. at 10:3–10.

On September 6, 2018, Klauenberg obtained an "administrative warrant" Form I-200 ("Warrant for Arrest of Alien") for Defendant. Dkt. 78 at 4:10–5:5; Dkt. 71-1. Klauenberg prepared the Form I-200 and his supervisor, as the "authorized immigration officer," signed it. Dkt. 78 at 9:11–25; Dkt, 71-1. The Form I-200 stated that the supervisor had "determined that there is probable cause to believe that Paredes, Perez, Antonio is removable from the United States," which determination was based on "the failure to establish admissibility subsequent to deferred inspection," as well as

> biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law, and/or statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

Dkt. 71-1. Klauenberg relied on Defendant's alien file in determining to seek the Form I-200. Dkt. 78 at 10:14–23.

The Government also produced materials pulled from Defendant's alien file that reflected information about Defendant from various immigration databases. See Dkt. 68 at 17:18–18:5; Dkt. 67. These included an "Immigration Alien Query" or "IAQ," which Klauenberg testified had notified ICE of Defendant's arrest in Charlottesville in 2015. Dkt. 68 at 17:18–20:2; Dkt. 67 at 1. This document was from the "TECS" database, which Klauenberg testified provided ICE's or USCIS's records held on a subject, including whether the subject has "ever been lawfully admitted," to the United States or if he has any immigration benefits. Dkt. 68 at 18:25–19:11. The first page of that document indicated that information came from "NLETS," another database, in April 2015. Dkt. 67 at 1. Klauenberg testified that NLETS is a state criminal database. Dkt. 68 at 19:12–19. Later, this document also reflected that Defendant was removed

on October 23, 2013, and that his final charge was that Defendant was an "alien present in US

w/o being admitted." Dkt. 67 at 4. The document further states: "I.C.E. records indicate that this

subject was removed from the United States. No record of a legal re-entry has been found." Id.

Klauenberg testified that this database search would have covered "anything that was granted to

him" permitting "a legal reentry." Dkt. 68 at 20:11–16. Other materials produced from his alien

file included a criminal history report, which also showed determinations of Defendant's

inadmissibility and expedited removals in 2013. Dkt. 67 at 8–9. Klauenberg also testified that

before he arrested Defendant, he ran a search of a database that informed him Defendant had no

claims for lawful readmission pending. Dkt. 68 at 24:16–25.

On October 16, 2018, ICE officers Klauenberg and Holland met at a nearby location

before proceeding to the address in a trailer park where they believed Defendant lived. Dkt. 68 at

10:11–11:3. ICE officer Holland parked inside the trailer park to identify anyone leaving the

residence, while ICE officer Klauenberg separately parked outside the trailer park since his

vehicle more closely resembled a police car. Id. at 10:25–11:5.

ICE officer Holland saw the subject exit the residence, get into the vehicle registered in

Defendant's name and exit the trailer park. Id. at 11:8–12. They followed him as he drove to a

gas station a mile or two from the residence. Id. ICE officer Klauenberg saw Defendant pull up

to a gas pump and exit his vehicle, and at which point he and Holland "pulled up alongside him

and that's when [they] approached him." Id. at 11:17–19. They "did not block [Defendant] in,"

but parked "next to him, kind of on an angle," close enough so that when Klauenberg exited his

vehicle he would be next to Defendant's vehicle. Id. at 30:12–15. Defendant was on the other

side of his vehicle at that time pumping gas. Id. at 12:17–25, 30:17–21.

ICE officer Klauenberg testified he knew that the subject was Mr. Paredes Perez because he was a male "matching his description. Based on the photo that we had when he exited his vehicle, he matched the description." Id. at 11:22–24. Defendant also "was driving the vehicle that he had registered in his name." Id. at 11:24–25.

ICE officer Klauenberg testified that as Defendant was filling up his truck with gas, they approached him "casually" and "asked him his name and if he had any identification on him." Id. at 12:1–6. Defendant "told [them] what his name was and provided [them] with his Mexican ID." Id. at 12:14–16. At that point, Klauenberg handcuffed Defendant and placed him in the back of Klauenberg's car. Id. at 12:19–20. The encounter lasted five to ten minutes. Id. at 12:21–23. Klauenberg and Holland were wearing bulletproof vests which read "Police" on the front and back; Klauenberg also testified that he was bearing an "ICE" badge. Id. at 12:7–9, 31:1–25.

ICE officer Klauenberg testified that he did not believe that he needed a warrant to arrest Defendant because "at that point, we were doing the administrative side of it, of reinstating the prior order of removal," and that he had "authority to arrest without a warrant for the administrative side" of a removal. Id. at 32:5–6, 36:19–20. Klauenberg testified that while he had the Form I-200 (i.e., the administrative warrant) when he arrested Defendant, it was not served on him, and ICE processed Defendant using the "more applicable" document, Form I-205, which applies to persons whom have had a prior order of removal. Dkt. 78 at 5:12–22, 8:19–9:2.

Defendant filed a motion to suppress the evidence obtained as a result of his encounter with officer Klauenberg, Dkt. 50, to which the Government responded, Dkt. 59. The Court held two hearings on Defendant's motion in which officer Klauenberg testified. Dkts. 68, 78. After the hearings, Defendant filed a supplemental brief with a substantial amount of attached material

in support of his motion to suppress, Dkt. 79, to which the Government also responded, Dkt. 87.

The motion to suppress is fully briefed and ripe for disposition.


Arguments

Defendant has moved to suppress all statements and evidence derived from his arrest, on the basis that it was evidence obtained during an illegal seizure that violated the Fourth Amendment. Dkt. 79 at 1. Defendant contends that ICE officer Klauenberg only believed he had probable cause to arrest Defendant "based on his search of the immigration databases, TECS, NLETS, CIS and PCQS," which had confirmed that Defendant had a prior expedited removal and had not applied for lawful entry. Id. at 11. However, Defendant argues that because "these databases are fundamentally flawed," the searches "were insufficient to provide probable cause to arrest" Defendant. Id. Defendant further asserts that officer Klauenberg did not otherwise "verif[y] [Defendant's] current immigration status before arresting him, apart from the database searches." Id.

Defendant's argument fails because it rests upon the incorrect premise that ICE officer Klauenberg found probable cause to arrest Defendant solely based on his searches of certain immigration databases. He did not. The evidence demonstrates that the ICE officers also relied upon and could find probable cause also taking into account (1) Defendant acknowledging his identity and giving them his Mexican ID card, provided during a voluntary encounter with the ICE officers; (2) ICE officer Klauenberg's review of Defendant's alien file, which showed Defendant's prior orders of expedited removal; and (3) Klauenberg's surveillance of Defendant's suspected residence, during which Klauenberg observed a car registered in Defendant's name and which Defendant was driving on the day of his arrest. Moreover, the California district court

case Defendant has cited as primary authority supporting his argument is distinguishable—it

exclusively involved instances where ICE officers found probable cause solely based upon

database searches, rather than, as here, the alien file or other evidence. And, in any event, the

Ninth Circuit has since overruled the decision upon which Defendant relies. Gonzalez v. United

States Immigration and Customs Enforcement, 975 F.3d 788 (9th Cir. 2020).

The Court will first address Defendant's encounter with the ICE officers at the gas

station. Next, the Court will address the evidence upon which the ICE officers relied in assessing

probable cause. Finally, the Court will address how Defendant's cited authority does not warrant

a contrary conclusion.

1.   Evidence Derived from Voluntary Encounter with ICE Officers

The Fourth Amendment to the U.S. Constitution guards against unreasonable searches

and seizures. However, the Supreme Court has "held repeatedly that mere police questioning

does not constitute a seizure" of a person. Florida v. Bostick, 501 U.S. 428, 434 (1991). Indeed,

"even when officers have no basis to suspect a particular individual, they may generally ask

questions of that individual," including "ask[ing] to examine the individual's identification." Id.

at 434–35 (citing INS v. Delgado, 466 U.S. 210, 216 (1984)). Whether a police encounter

constitutes a seizure depends on "whether the police conduct would have communicated to a

reasonable person that the person was not free to decline the officers' requests or otherwise

terminate the encounter," considering all circumstances surrounding the encounter. Id. at 439.

In this case, the evidence demonstrates that on the morning of October 16, 2018, ICE

officers Klauenberg and Holland did not "seize" Defendant for Fourth Amendment purposes

until they handcuffed him and placed him under arrest. The undisputed evidence is that, before

then, the officers approached Defendant "casually" and "just walked up to him," and "[a]sked

him his name and if he had any identification on him ….." Dkt. 68 at 12. Asking for one's name

or identification are questions that officers can generally ask without converting any consensual

encounter into a seizure. Santos v. Frederick Cty. Bd. of Comm'rs, 725 F.3d 451, 460–61 (4th

Cir. 2013); Bostick, 501 U.S. at 434–35. There is no evidence that those questions were asked in

anything other than a casual or conversational tone. Dkt. 68 at 12, 29–31; United States v.

Weaver, 282 F.3d 302, 312 (4th Cir. 2002) (considering, in totality-of-the-circumstances test,

"the words used by the officer," as well as "the officer's tone of voice and general demeanor");

United States v. Gray, 883 F.2d 320, 322–23 (4th Cir. 1989) (courts to consider whether the

officer's questioning was "conversational rather than intimidating") (internal quotation marks

omitted). Indeed, ICE officers are authorized by statute "to interrogate any alien or person

believed to be an alien as to his right to be or remain in the United States." 8 U.S.C. § 1357(a).

This encounter took place in public, at a gas station, Dkt. 68 at 11–12, 30, and that setting

is another factor diminishing any coerciveness of a police-citizen encounter, Gray, 883 F.2d at

323–24. The evidence also supports a finding that there was no restraint on Defendant's

movement. Before Defendant was handcuffed, the ICE officers did not touch him or physically

intimidate him in any way. Nor did they or their vehicles block Defendant's movement, nor

block his car. ICE officer Klauenberg testified that they "pulled up alongside" of Defendant's

vehicle while at the gas station and "did not block him in, like perpendicular. We were kind of

next time him, kind of on an angle, would be my best guess." Dkt. 68 at 30:14–15. When ICE

officer Klauenberg got out of his own vehicle, he was next to the passenger side of Defendant's

vehicle, and Defendant was on the other side of his vehicle at the gas station pump getting gas.

Id. No evidence in the record shows that the ICE officers or their vehicles blocked in Defendant

or his vehicle. Compare United States v. Cloud, 994 F.3d 233, 238, 243 (4th Cir. 2021) (holding

that a reasonable person would not be free to leave when officer's car was parked behind and perpendicular to suspect's car—leaving no "clear path" for the driver to back out—and when two officers were shining flashlights into the vehicle at its occupants and "continually" asking whether there were guns or drugs in the vehicle).

To be sure, in this case two ICE officers were present, they were wearing bulletproof vests that displaced "Police," and ICE officer Klauenberg's vest had a badge reading "ICE." Dkt. 68 at 31. However, at no time did they display or draw their weapons and they did not touch Defendant up until the point that he was placed in handcuffs. Therefore, this factor also does not weigh in favor of a "seizure." See, e.g., Gray, 883 F.2d at 322–23 (two plain-clothes officers questioned the defendant in comparable manner and "requested and received [his] identification card," held to be a consensual encounter); United States v. Johnson, No. 3:15-cr-166, 2016 WL 6803108, at *3 (W.D.N.C. Nov. 16, 2016) (finding voluntary police-citizen encounter when two detectives approached defendant and asked for ID and whether he was armed, when there was no evidence the detectives displayed their weapons or physically touched defendant).

Accordingly, under applicable and controlling precedent, the Court must conclude that under the totality of the circumstances, a reasonable person in Defendant's position would have believed he was free to leave and terminate the encounter, and therefore, there was no "seizure" under the Fourth Amendment until Defendant was handcuffed. Accordingly, the Court agrees with the Government that Defendant's response to the ICE officers providing his name and handing them his Mexican identification card, will not be suppressed because Defendant provided them in the course of a voluntary encounter with the ICE officers. See Dkt. 59 at 3–4; Dkt. 87 at 3–4.

9

2.  <u>Determination of Probable Cause</u>

Defendant's argument that the ICE officers exclusively relied on information gleaned

from their database searches in deciding to arrest Defendant, rests on the incorrect premise that

they had no other information upon which to make the arrest besides their database searches.

Dkt. 79 at 11–12. Rather, ICE officer Klauenberg had probable cause to conduct a warrantless

arrest of Defendant on the morning of October 16, 2018, at the point he placed Defendant in

handcuffs. That probable cause was supported by his investigation and facts well beyond the

database searches alone.

The Fourth Amendment permits "the warrantless arrest of an individual in a public place

upon probable cause." <u>United States v. Santana</u>, 427 U.S. 38, 42 (1976). A warrantless arrest by

a law officer is "reasonable under the Fourth Amendment where there is probable cause to

believe that a criminal offense has been or is being committed." <u>Devenpeck v. Alford</u>, 543 U.S.

146, 152 (2004). "Probable cause is not a high bar, and it must be assessed objectively based on

the totality of the circumstances, including common-sense conclusions about human behavior."

<u>United States v. Jones</u>, 952 F.3d 153, 158 (4th Cir. 2020) (internal quotation marks omitted).

Significantly, the evidence shows that ICE officer Klauenberg was familiar with and had

reviewed and relied on Defendant's alien file or "A-File" prior to his arrest on October 16, 2018;

and further, that Defendant's alien file showed Defendant's prior order of expedited removal in

March 2013, and that such order was reinstated in October 2013. <u>See</u> Dkt. 68 at 6:11–7:5, 17:18–

21:1, 26:3–27:12; Dkt. 78 at 9:11–10:23; Dkt. 32 Exs. 1, 2 (orders of removal); Dkt. 87-1 at 1

(notice to Defendant that he was prohibited from being in the United States for twenty more

years); <u>see also</u> <u>Sosa-Carabantes</u>, 561 F.3d at 258 n.3 (describing alien file); <u>United States v.</u>

<u>Farias-Gonzalez</u>, 556 F.3d 1181, 1184 n.2 (11th Cir. 2009) (same). That file further provided that

"I.C.E. records indicate that this subject was removed from the United States. No record of a legal re-entry has been found." Dkt. 67 at 4. ICE officer Klauenberg also testified that, before he arrested Defendant, he ran a search of a database that informed him Defendant had no claims for lawful readmission pending. Dkt. 68 at 24:16–25.

In addition, the Field Operations Worksheet or "FOW" for Defendant contained his photo. Dkt. 67 at 12. ICE officer Klauenberg testified that, after reviewing Defendant's FOW, Klauenberg found what he believed was a current address for Defendant, and then Klauenberg conducted surveillance on the residence. Dkt. 68 at 9:2–10:2. During surveillance, Klauenberg ran registration checks of several vehicles parked at the residence: he found one was registered in Defendant's name, another was registered in the name of a female with the same last name, and another was registered to a male with a similar last name. Id.

Then, on the morning of October 16, 2018, ICE officers Klauenberg and Holland followed a suspect they believed to be Defendant leave that residence, in the vehicle registered in Defendant's name, and the suspect "was a male matching his description" "based on the photo that [ICE] had when he existed his vehicle, he matched the description." Dkt. 68 at 20–25. When the ICE officers approached Defendant and "[a]sked him his name and if he had any identification on him," Defendant "told [them] what his name was and provided [them] with his Mexican ID."  Dkt. 68 at 12:12–20.

The facts of this case are similar to those in the Fourth Circuit's recent decision in United States v. Santos-Portillo, ___ F.3d ___, 2021 WL 1823284 (4th Cir. May 7, 2021). In that case, an officer with the Department of Homeland Security ran a check of a license plate number after (mistakenly) believing the driver was somebody he recognized in a prior case; based on the records check, the officer subsequently "learned that Santos-Portillo was a Honduran national

who was in the United States illegally." Id. at *1. The officer further discovered Santos-Portillo

had a Texas felony conviction for fleeing law enforcement, and that he "had consequently been

deported in 2011," and the officer "also found a photograph of Santos-Portillo in his immigration

file." Id. Because the officer concluded Santos-Portillo "was in the United States illegally," he

and other officers "staked out Santos-Portillo's house," and when they confronted him outside it,

"Santos-Portillo gave his name and admitted he was from Honduras." Id. The officers arrested

him and took him to an ICE office, and he was charged with illegally reentry, in violation of 8

U.S.C. § 1326(a). Id. In explaining that the constitutional minima were met for probable cause

upon arrest, the Fourth Circuit explained that the officer "had accessed the immigration file

containing an identifying photo and clear proof that Santos-Portillo was a convicted felon who

had been deported, meaning he was almost certainly in the United States illegally." Id. at *3

(emphasis added). Elsewhere, the court characterized this case as one of a "perfectly lawful

arrest" based upon "airtight probable cause to proceed." Id. at *5 (emphasis added). The court

noted that the officer in that case had "confirmed appellant's previous conviction, his prior

deportation, and his subsequent reentry," and "[h]e got Santos-Portillo to confirm his identity

and country of origin before arresting him." Id.[2]

Other cases similarly demonstrate that probable cause is supported where, as here, an

immigration officer has reviewed a subject's alien file that shows their prior removal from the

United States—corroborating that their presence in the United States would violate 8 U.S.C.

---

[2] To be sure, the issue of probable cause was not disputed in Santos-Portillo, as "the parties agree[d] there is no constitutional violation" in the case. Id. at *3. Rather, the defendant argued that the evidence against him should be suppressed because the federal officers had arrested him without an administrative warrant pursuant to 8 U.S.C. § 1357(a). Id. at *1. The Fourth Circuit rejected that argument, concluding instead Congress had not authorized the exclusion of evidence as a remedy for a violation of that statute. Id. at *6.

12

§ 1326(a)—as well as based on identifying information about and/or photographs identifying the subject. See, e.g., United States v. Segura-Gomez, No. 4:17-cr-65, 2018 WL 6259222, at *4 (E.D.N.C. Nov. 30, 2018). Under the "totality of the circumstances," Jones, 952 F.3d at 158, the Court concludes that ICE officer Klauenberg had more than ample probable cause to believe that a felony was or had been committed, namely, that Defendant illegally reentered the United States after having been previously removed, in violation of 8 U.S.C. § 1326(a).

   3.   Gonzalez v. U.S. Immigration & Customs Enforcement

Defendant's lead case in support of his argument that probable cause was lacking is a district court case from the Central District of California. Dkt. 79 at 4–9, 11–12. See Gonzalez v. U.S. Immigration & Customs Enforcement, 2019 WL 4734579 (C.D. Cal. Sept. 27, 2019). Defendant cites that court's decision enjoining ICE from issuing detainers "on the basis of database searches alone, because the database searches often contain incomplete data, have significant errors, and were not designed to provide information that would be used to determine removability." Dkt. 79 at 4. Defendant cites many findings of fact entered by that court and also seeks to have this Court take judicial notice of them, Defendant argues that "[f]or the very same reason that searches of these immigration databases alone is insufficient to provide probable cause to issue an ICE detainer, the database searches were insufficient to provide probable cause to arrest [Defendant]." Dkt. 79 at 13.

The Gonzalez decision does not support Defendant's argument that there was no probable cause here, for two separate reasons. First, Gonzalez is readily distinguishable from this case. The district court's injunction only forbade ICE "from issuing detainers to class members based solely on searches of electronic databases to make probable cause determinations of removability." Gonzalez, 975 F.3d at 797 (emphasis added). Indeed, the class at issue in that

case was "defined as those individuals against whom ICE issued a detainer based solely on searches of electronic databases." Id. at 808 (emphasis added). Accordingly, the Ninth Circuit explained that, "because the Database Claim challenges the Government's practice of issuing immigration detainers based solely on searches of electronic databases, the probable cause determinations here hinge entirely on the reliability of the databases." Id. at 820 (emphasis added). As recounted above, that is far from the case here. Among other evidence, ICE officer Klauenberg reviewed and relied on Defendant's alien file which showed his prior expedited removals in 2013, he conducted database searches, he conducted surveillance of Defendant's residence, ran vehicle registration checks for those vehicles at the property, observed Defendant get into a vehicle registered in his name and when Defendant exited the vehicle was able to identify him based on a photograph in his file, and Defendant voluntarily confirmed his name and when asked for identification provided a Mexican ID.

Second, the Ninth Circuit subsequently reversed and vacated the California district court decision upon which Defendant relies, holding that it was "premised on legal error and lacks critical factual findings," as by "fail[ing] to assess error in the system of databases on which ICE relies to make probable cause determinations of removability." Id. at 798. Indeed, the Ninth Circuit characterized some of the district court's factual findings as making "sweeping, categorical conclusions about the databases on which ICE relies." Id. at 820–21. However, the Ninth Circuit found those findings "suffer[ed] from a key shortcoming: the district court did not make reliability findings for all the databases on which ICE relies," including failing to assess the reliability of the PCQS (Person Centric Query Search), and the NCIC and NLETS databases. Id. at 821. Indeed, in this case, Klauenberg testified that he had conducted searches on, and Defendant's alien file included information from, the PCQS, NCIC and NLETS databases,

14

among others. Dkt. 68 at 19:12–21:15 (citing PCQS as a "system that checks TECS, claims, immigration databases to see if he has any applications pending or has been granted anything"); id. at 24:16–25:3 (describing his running a search through PCQS which confirmed Defendant had no claims for legal immigration status pending). Because the Gonzalez v. U.S. Immigration & Customs Enforcement decision Defendant cites is readily distinguishable and has since been overturned, and because under the totality of the evidence, ICE officer Klauenberg had ample probable cause to arrest Defendant for illegal reentry, this decision does not support any contrary outcome.

For these reasons, Defendant's motion to suppress will be and hereby is **DENIED**. Dkt. 50. It is so **ORDERED**.

The Clerk of Court is directed to send a certified copy of this Memorandum Opinion and Order to all counsel of record.

Entered this  20th  day of May, 2021.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

15